**E X H I B I T**

**"C"**

1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    --------------------------------X
3
    UNITED STATES OF AMERICA,              CR 10-991
4

5        -against-
                                          U.S. Courthouse
6                                         Central Islip, NY
    BRIAN SULLIVAN,
7                                         May 11, 2012
         Defendant.                       11:00 a.m.
8
    --------------------------------X
9

10                   TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE JOANNA SEYBERT
11               UNITED STATES DISTRICT JUDGE

12
    APPEARANCES:
13
    For the Government:        LORETTA E. LYNCH
14                             United States Attorney
                               100 Federal Plaza
15                             Central Islip, NY 11722
                               By:  MICHAEL CANTY
16                                  Assistant U.S. Attorney

17  For the Defendant:         JOHN CARMAN, ESQ.

18

19

20  Court Reporter:            Owen M. Wicker, R.P.R.
                               100 Federal Plaza
21                             Central Islip, NY 11722
                               (631) 712-6102
22

23

24  Proceedings recorded by mechanical stenography; transcript
    produced by computer transcription.
25

2

1               (Case called.)

2               MR. CANTY:  On behalf of the United States,

3        Michael Canty.

4               MR. CARMAN:  Good morning, your Honor.  John

5        Carman.

6               THE COURT:  Good morning, Mr. Carman.

7               And good morning, Mr. Canty and Mr. Sullivan.

8               Defendant ready for sentencing?

9               MR. CARMAN:  Yes, your Honor.

10               THE COURT:  We'll swear you in.

11               (Defendant sworn.)

12               THE COURT:  Mr. Sullivan, you've been sworn in.

13        That means you must tell the truth.  If you don't tell the

14        truth, you will be charged with perjury and face

15        additional penalties.

16               Do you understand that?

17               THE DEFENDANT:  I understand.

18               THE COURT:  If you don't understand a question

19        that I ask you, let me know you don't understand the

20        question, and I'll rephrase it.

21               If you want to speak to your attorney in private

22        at any time before answering a question, let me know that,

23        and I'll give you an opportunity.

24               THE DEFENDANT:  Thank you.

25               THE COURT:  Are you willing to answer my

3

1   questions under oath, knowing that you will be sent to

2   jail for additional time if you lie?

3   　　　　　　THE DEFENDANT:  Yes.

4   　　　　　　THE COURT:  Prior to coming to court today, have

5   you had any medication at all, drugs, alcohol, anything of

6   that sort?

7   　　　　　　THE DEFENDANT:  No.

8   　　　　　　THE COURT:  Any reason you cannot understand

9   this proceeding?

10  　　　　　　THE DEFENDANT:  No.

11  　　　　　　THE COURT:  You've had an opportunity to review

12  all the documents that have been submitted, your

13  attorney's presentence memoranda, your own letter that you

14  prepared, obviously, and you've had an opportunity to look

15  at that.  And in addition, the presentence investigation

16  report and a recommendation of the probation department.

17  　　　　　　Is it fair to say?

18  　　　　　　THE DEFENDANT:  Yes, correct.

19  　　　　　　THE COURT:  You know that you have a right to

20  speak to me directly at the time of sentence as to what

21  you think your sentence should be or anything else you

22  think is relevant to sentencing?

23  　　　　　　THE DEFENDANT:  Okay.

24  　　　　　　THE COURT:  Let me tell you what I've looked at

25  in terms of your documents here:

4

1          Your plea agreement that sets forth a level 14
2    and which would carry a range of imprisonment from 27 to
3    33 months.

4          You indicated you would not file an appeal if
5    your sentence was a sentence that was 33 months or less,
6    whatever the Court assessment was, however it was in the
7    sentencing guidelines.  Is that correct?

8          MR. CARMAN:  Judge --

9          THE COURT:  There was a global plea.  I
10   understand the position of the probation department is not
11   supportive of that global plea; is that correct?

12         MR. CARMAN:  Yes, your Honor.

13         THE COURT:  Thank you.

14         So it's the Court's understanding that the
15   defendant has signed -- incorporated in his plea agreement
16   as a condition that he does not have the ability to appeal
17   the Court's sentence if it is 33 months or less.  Is it
18   fair to say?

19         THE DEFENDANT:  Yes.

20         THE COURT:  So in addition to reviewing your
21   plea agreement and the plea you have taken before Judge
22   Tomlinson and the Court accepted, I have reviewed a letter
23   from your mother.

24         I have reviewed letters that were incorporated
25   by Mr. Carman in the sentencing memorandum.

5

```
 1              I've reviewed Mr. Carman's sentencing memoranda.
 2              I've reviewed the letter of your uncle with D&D
 3    Electric.
 4              I've reviewed your letter, obviously, to the
 5    Court.
 6              I've reviewed the presentence investigation
 7    report from Probation.
 8              I also have reviewed, in view of the fact you
 9    were on supervised release, the violation that is pending
10    before Judge Platt, who you received a sentence of
11    120 months on a federal defense some time ago.
12              Is there anything else that I should have?
13              THE DEFENDANT:  No, that should be all.
14              THE COURT:  So with respect to that, let's start
15    out with the assessment of the sentencing guidelines.
16              Mr. Carman and the Government, you've agreed
17    that it should be an additional level for the defendant
18    being included in a global --
19              MR. CANTY:  Yes, your Honor.
20              THE COURT:  If the Court adopts this, as it
21    generally does, I'll be able to come up with a total
22    offense level of 12.  Is that accurate?
23              MR. CANTY:  That's correct, your Honor.
24              THE COURT:  And in view of the defendant's
25    criminal history of five, is it?
```

6

1          MR. CANTY:  Four, your Honor.

2          THE COURT:  Four.

3                  The defendant would be in a zone of up to

4     27 months.  Is that accurate?

5          MR. CANTY:  That's correct, 21 to 27 months.

6          THE COURT:  So the Court adopts that.

7                  Are there any objections to anything contained

8     in the presentence investigation report?

9          MR. CARMAN:  No, your Honor.

10          MR. CANTY:  No, your Honor.

11          THE COURT:  I would indicate to you that I have

12     discussed the report with the probation officer that

13     prepared the report, and I've discussed these issues with

14     the probation officer who supervised the defendant during

15     his period of supervised release.  All right.

16                  Is there anything else anyone can think of that

17     would be important for me to know?

18          MR. CARMAN:  One second, your Honor.

19          (Counsel confers with defendant.)

20          MR. CARMAN:  That's all we have, your Honor.

21          THE COURT:  I would indicate one other item of

22     information that I think is important, and it is included

23     in the probation department's report.

24                  Reached out to the defendant's mother, who

25     submitted a letter to the Court which was not filed with

7

1   Probation, indicating all the reasons why the defendant

2   should be given a lenient sentence.  And the defendant's

3   mother never spoke to the officer who requested a

4   discussion with that family member, nor did the

5   defendant's uncle, who represented there's a job waiting

6   for the defendant.

7           And you've discussed that with the probation

8   officer, although there was an attempt made to elicit this

9   information -- I see the defendant's mother shaking her

10  head in the back.  If you want an opportunity to talk to

11  her, that's fine.

12          But it did seem odd to me, from getting these

13  letters from family members and the representations made

14  in the letter, that no one responded to the request of the

15  probation officer to speak to them.

16          MR. CARMAN:  Your Honor, since I was not in that

17  loop, and this seems to be a matter that is relevant to

18  the Court's consideration here today, I would like to take

19  you up on that opportunity to speak with them briefly.

20          THE COURT:  Take your time, and I'll remain on

21  the bench.

22          MR. CARMAN:  Thank you.

23          (Pause in proceedings.)

24          THE COURT:  And I would also mention to you,

25  Mr. Carman, although our records show your memoranda for

8

1  the defendant's sentence was filed by ECF on May 7, 2012,

2  the probation department indicated they didn't get the

3  bounce on this, for whatever reason. But I did allow

4  Ms. Kaplan to review the report.

5      MR. CARMAN: My understanding, that should

6  happen automatically.

7      THE COURT: So I don't fault either side.

8  Whatever occurred, occurred.

9      I'm sure Probation will make sure that if they

10  are not getting them automatically, which you normally

11  do --

12      THE PROBATION OFFICER: Sometimes in a

13  multidefendant case, it goes through the main office.

14      THE COURT: Okay.

15      MR. CARMAN: Your Honor, having had the

16  opportunity to speak to Mr. Sullivan's mom, Janet Brosac,

17  in the courtroom, I'm informed she had a detailed and

18  extensive conversation with Probation Officer Kaplan.

19  What specifically was discussed, I didn't get into the

20  detail of that, but there was telephone contact between

21  the two of them.

22      With regard to the uncle's representation there

23  was a job available for Mr. Sullivan on release that would

24  be held for him, the uncle is not present in court, so I

25  did not have the ability to speak with him.



9

| 1 | Ms. Brosac thought that the uncle was waiting |

 1     Ms. Brosac thought that the uncle was waiting

 2   for a contact from Probation.  Clearly, there was a

 3   communication gap that should have been filled.  But

 4   without them being in here, I can't say for sure --

 5     THE COURT:  The problem was that D&D Electric,

 6   although representing the defendant was employed by them

 7   during the seven or eight months that he was released, no

 8   one was able to verify that employment.  It was very

 9'  difficult for Ms. Kaplan to make that notation.

 10     MR. CARMAN:  Your Honor, to the extent this is

 11  helpful, I do have a copy of a W-2 from D&D Electric that

 12  shows earnings by Mr. Sullivan during the relevant time

 13  frame.

 14     THE COURT:  How much are the earnings for, and

 15  what is the period?

 16     MR. CARMAN:  It shows earning of approximately

 17  $5,000 during that time frame.  So --

 18     THE COURT:  And the time frame was from when to

 19  when?

 20     MR. CARMAN:  What I see -- your Honor, the

 21  actual W-2 doesn't have a date, but the actual amount is

 22  reflected in a 1040-EZ for the name of Brian Sullivan for

 23  the year 2010.  This W-2 seems to correlate.

 24     I don't think this is an enormous piece of the

 25  puzzle but perhaps just a slice --

10

1     THE COURT:  Yes, that the Court should consider.

2     In terms of a telephonic interview with the

3  defendant's mother, it is noted in paragraph 133 that at

4  that time, the defendant's mother corroborated the

5  majority of the personal history information.

6     So there was a phone conversation then.

7     Is Mrs. Brosac saying that she had another

8  conversation with Ms. Kaplan more recently?

9     MR. CARMAN:  Your Honor, my understanding was

10  there was at least one extensive conversation.

11     If you would like to ask whether I could

12  ascertain that, I could do that.

13     THE COURT:  Sure.

14     (Mr. Carman confers with a member of the

15  audience.)

16     THE COURT:  Before you respond, perhaps you

17  should also note 'in paragraph 124 it was reported that

18  several messages have been left by the undersigned,

19  Ms. Kaplan, the undersigned probation officer, for

20  defendant's mother and brother to telephonically contact

21  the probation department for updated corroborative

22  interviews.  The messages have not been returned.

23     A letter also has been sent to the mother's

24  residence requesting she and the brother contact the

25  undersigned probation officer, but a response has also not

11

1   yet been received.

2            Notably, the updated information has been

3   verified by the defendant's supervising probation officer.

4            Now, this report was prepared -- if I have the

5   correct date here, he was originally going to be sentenced

6   December 9th, and that report was prepared on

7   November 21st of 2011.

8            MR. CARMAN:  So this report was prepared

9   principally in November of 2011.

10           THE COURT:  Correct.

11           MR. CARMAN:  What I'm understanding from

12   Ms. Brosac, your Honor, there were attempts by Probation,

13   whether it was by Ms. Kaplan and/or her supervisor,

14   telephonically, that wasn't successful.  She thought

15   perhaps it was January or February 2012 where she called

16   early in the morning, prior to work.  And she believes it

17   was Ms. Kaplan that she had detailed conversation with.

18           It seems that conversation may have been a

19   vestige of the early version of this report that wasn't

20   amended after the telephone contact.  That seems it is a

21   fair characterization that occurred there.

22           THE COURT:  Ms. Kaplan, do you have any notes

23   reflecting the conversation with the defendant's mother?

24           THE PROBATION OFFICER:  I don't, your Honor.  I

25   don't have the file with me.  If it is early in the

12

1  morning, I don't think it possibly could be, but I don't
2  have the report with me.
3          THE COURT:  Do you think you want to go down and
4  get your file to check?
5          THE PROBATION OFFICER:  No.
6          THE COURT:  So perhaps it was corroborated by
7  the defendant's mother, as she has indicated.  So the
8  Court will not consider that reference.
9          Going back to the report itself, are there any
10 objections you can think of, Mr. Carman, that you might
11 not have included in your sentencing memoranda?
12         MR. CARMAN:  Your Honor, I had a very extensive
13 opportunity to review the report with Mr. Sullivan prior
14 to filing the memorandum.  I've had conversations with him
15 since.  I don't think there is anything that we need to
16 raise in court that is not in my memo.
17         THE COURT:  Mr. Carman, you laid out reasons in
18 your sentencing memoranda why the defendant should receive
19 a lenient sentence:  He should get the 21 months because
20 he faces additional penalties with Judge Platt.
21         You submitted a variety of things that the
22 defendant has done since he was in custody, including
23 various religious courses, Salvation Army.
24         I have the letter from Mr. Gary Priboy
25 [phonetic] with regard to the defendant's progress as

13

1   being a leader, which seems to be, shall I say, not a

2   unique occurrence with inmates who go in, and they are a

3   little bit older than the average inmates. They became

4   expedited, or leaders, as DART seems to indicate they are.

5         But I looked at it. I've considered it and the

6   other reasons you've given: that the defendant

7   desperately wants to have a more regular contact, if you

8   will, with his daughter, who is now 17 years old.

9         I've considered the reasons that the defendant's

10  mother has financial issues; that the defendant was going

11  to be giving her $100 a week -- or a month, rather, to

12  assist in the payment of her mortgage and other things;

13  that the defendant's stepfather has been disabled for many

14  years, and the burden falls on the defendant's mother and

15  the defendant's brother.

16        He's a young person, and I think -- he's here in

17  court, and he's attending school.

18        I've considered a lot of these issues. So I

19  have those arguments.

20        But then perhaps you can respond to some of the

21  Court's concerns; my primary concern, frankly, that this

22  defendant technically is still in a halfway house.

23        What does he do in June of 2010 while he's now

24  having the luxury of being released? He starts calling up

25  the person he knows is a convicted defendant, Dominick

**14**

1  Curatola. And Dominick Curatola will set up the deal.

2  And we all know Mr. Curatola was sentenced a week or so

3  ago, and he set up all the deals with Mr. Curatola.

4        The thing that concerns me and devastates some

5  of the representations the defendant makes in terms of his

6  bad choices is that the defendant, in tapes that the

7  Government has, wiretaps, if you will, the defendant

8  cultured Mr. Curatola on how to beat probation. And that

9  really is astounding to me.

10        Here's a person, this defendant, who has served

11  a ten-year sentence by Judge Spatt -- by Judge Platt. He

12  makes all these representations that he's working a job,

13  doing everything possible to renew his relationship with

14  his young daughter, that he has to help his mom, he has to

15  do all of these things.

16        And then within a very short period of time,

17  he's associated with a convicted felon. He's back in the

18  same routine in terms of dealing drugs, and he's culturing

19  people on how to beat the probation department. He goes

20  from a coach, and suddenly goes over to the DART program,

21  and now he's a leader.

22        I think one has to really seriously discount his

23  representation of remorse and sincerity. That is my

24  concern, that and the fact that the defendant has

25  repeatedly taken the easy way out; that the defendant

15

1   denies that he ever did anything to the mother of his

2   child.

3          I realize that is ancient history in some way.

4   He apparently has convinced himself a lot of this didn't

5   occur.  There was many, many arrests.  And I'll discount

6   half the arrests with respect to prior orders of -- but

7   the representation that the defendant is a nonviolent

8   person, I can't make that determination based on the

9   information I have on the defendant before me, but I'm

10  somewhat concerned about that representation.

11         More importantly, this defendant had a golden

12  opportunity.  He might have thought it was demeaning to be

13  making 7 or $8 an hour, but he had an opportunity to

14  straighten himself out.  And it didn't take him long to

15  throw that away, and that's my primary concern.

16         I know he'll be dealt with this in Judge Platt's

17  consideration, but -- courtroom, but how much faith should

18  I have in this courtroom after a term of 21-months,

19  25 months, 27 months?  He has a number of prior felonies

20  and, more importantly, he's abused the trust of the Court.

21         So I look forward to your comments and his

22  comments also.

23         MR. CARMAN:  Well, your Honor, obviously, as we

24  arrived here today, you have a lot of experience with this

25  case, having dealt with Mr. Curatola, your references to

16

1    Mr. Sullivan coaching Mr. Curatola or any other person on

2    ways to beat probation. You know, we reviewed a lot of

3    Rule 16 in this case. I don't ever remember seeing that.

4         I looked sideways at my client as you were

5    talking, and he told me while you were speaking like that,

6    he never recalled doing anything like that.

7         What I would say, when you have people who are

8    intercepted on wiretaps, people say all different things,

9    share their experiences. Yes, he's associated with a

10   known felon, Curatola, and it's to be condemned. It's

11   horrible judgment and certainly, I think, justifies many

12   of the remarks you've just made.

13        In your summary of all the bads things you could

14   think of, I think you made reference to my proposal of the

15   sentencing at the low end of the range. That may have

16   been on Mr. Sullivan's letter.

17        I've appeared before you on many occasions. I'm

18   coming before you this morning because of Mr. Sullivan,

19   only because if the time is a Criminal History Category IV

20   and not a Criminal History Category V or VI, he would face

21   a very tall hill to climb in convincing you that he was

22   deserving of some measure of leniency.

23        I doubt it -- I wrote -- I'm virtually certain I

24   did not write in my memorandum you should sentence him in

25   the lower end of the range. I thought if you departed

17

1    from the probation department's recommendation of 27 in

2    any degree, I would regard that as a victory, frankly.

3             I thought you would say virtually everything you

4    just said in this courtroom.  And I don't think it took a

5    lot of experience with you as a judge.  It's what he

6    should have expected to hear.

7             Having said all of that -- and I think every

8    point I was about to have made, and I probably could have

9    sat down.  I would have presented it from a different

10   angle.  And you shot down a lot of nice things I planned

11   to say.

12            THE COURT:  I said a lot of good things at the

13   bottom.

14            MR. CARMAN:  You did.  But there is not a light

15   of disagreement with Brian and what he has done in his

16   life, and the opportunity that he squandered, and the

17   loyalty and love of his family members that continue

18   through today that he has put through the proverbial

19   ringer.

20            In sentencing him for his conduct in this case,

21   while subject to federal supervision, what is fair and

22   what is appropriate, I think as a human being we do have

23   the chance here to look at the struggle of a guy like

24   Brian, who many of the circumstances are self-made.  He's

25   a convicted felon.  He's out of prison.  He has financial

18

1 obligations that are significant, that are beyond his

2 means, your Honor.

3          This is not an excuse for engaging in a

4 marijuana conspiracy with known felons. But I think that

5 the idea that Brian was, to a degree, incapable of seeing

6 the other options at the time has some validity.

7          To the extent that it does, I think that it

8 dovetails into an argument that his role in this case, his

9 benefit from this case, which he tells me -- and if you

10 take this with a grain of salt and consider it to be

11 understated, is still a dramatically and remarkably small

12 degree of remuneration.

13          He tells me he thought he made $1,000. And this

14 was a financial crime he was undertaking to involve

15 himself, 1,000 bucks for this. Not just this. It's the

16 21 to 27 that he's exposed to with your Honor.

17          And certainly, as you appropriately pointed out,

18 our next stop today, your Honor, is a couple of doors

19 down, where he's subject to this violation of supervised

20 release, where the recommended sentencing exposure is in

21 the nature of 46 to, I think, 53 months, or something like

22 that. And it is presumptively consecutive.

23          Those are big numbers, even big numbers for a

24 Brian Sullivan, who has spent the last part of ten years

25 in prison. When it is correlated with the amount of

19

1   money, it's correlated with a person who, I think, found

2   himself between what he thought was a rock and a hard

3   place.

4          I think those are huge numbers.  And I think no

5   matter what you do here today, that in the end, nobody

6   will be able to say that Brian Sullivan went underpunished

7   for his conduct here.  He has accepted responsibility.  He

8   has acknowledged what he has done.

9          In his time in the Nassau County jail, your

10  Honor, he has taken advantage of every program.  He has

11  been a leader, hasn't been a rabble-rouser, hasn't gotten

12  into fights with people.  He has suffered, as they all do

13  in there, and has done it with some dignity.

14         I guess he could have taken a different

15  approach.  Maybe he's --

16         THE COURT:  He's 39 years old.

17         MR. CARMAN:  Some people take 39; some people

18  take longer.  We can only hope that Brian has learned from

19  this experience and learned from the sentence you will

20  impose today, and from Judge Platt, what his true fate

21  will be with respect to these decisions.  It will be

22  severe at the end, and he will not be underpunished.

23         That is the basis for my request:  to that

24  extent, to any extent, that you could put in your own

25  heart and mind to justify some leniency, that there might

20

1    be some credit to him.

2            THE COURT:  Thank you, Mr. Carman.

3            Mr. Sullivan, I look forward to your remarks

4    about -- with respect to the amount of knowledge with

5    respect to marijuana.  And you are talking about 10 and

6    20 kilograms of marijuana.

7            You made a lot of phone calls, a lot of

8    representations, and you were in the thick of things, if

9    you will.  Explain to me why you think this does not

10   warrant the recommended sentence of the probation

11   department.

12           THE DEFENDANT:  Your Honor, if you have a

13   minute.  I know you are busy.

14           THE COURT:  I have a minute.  I'm a very patient

15   woman, Mr. Sullivan.

16           THE DEFENDANT:  The first thing I want to

17   address, which bothers me the most, the domestic violence

18   17 years ago.

19           THE COURT:  It bothers me too, sir.

20           THE DEFENDANT:  I understand.  If anybody it

21   would bother, it bother me.  My child's mother, I talk to

22   her still, to this day, twice a week on the phone.

23           THE COURT:  To your child or child's mother?

24           THE DEFENDANT:  This is my child's mother.

25           THE COURT:  All right.

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

21

1      THE DEFENDANT: I got involved in a
2   relationship. I think I was 20 years old at the time.
3   And I was with a younger lady whose mother had seven
4   separate orders of protection out. Three was against her
5   kids. She used to have my daughter's mother arrested. A
6   lot of it was just tit for tats.

7      THE COURT: Tit for tats. There's an allegation
8   in this probation report that you held her hostage and
9   beat her for days.

10      THE DEFENDANT: Your Honor, I never held her
11   hostage, never beat her for days. In 1997 I went to trial
12   for another complaint she made. I finally stopped
13   pleading guilty to this in front of Michael Mullen, who
14   since retired and revoked his order of protection, and
15   said she used it as a sword, not a shield.

16      THE COURT: You served a year in jail?

17      THE DEFENDANT: I took a plea of guilty that
18   made it concurrent with the prior case, but it's not as it
19   is written out to be, that I held her and I beat her.
20   She's a woman. To this day, when I was out on parole, we
21   went out for dinner. I don't put my hands on her. We're
22   very cordial with my daughter. She has a boyfriend that I
23   speak to.

24      THE COURT: She certainly didn't call the
25   probation department when she asked her to call?

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

22

1          THE DEFENDANT:  Your Honor, she wouldn't get
2    involved if anyone called or went to a job.  She works
3    seven days a week, runs a retail store in Massapequa to
4    support my daughter.  She is obligated to it.  She raised
5    my daughter, and I have to pay it, the child support.

6          I'm not trying to run from my obligation there,
7    but I'm trying to address that situation.  It was 17 years
8    ago.  And I do speak to her and my daughter twice a week.

9          I understand everything is under perjury.

10         The second thing I want to address, I don't ever
11   recall speaking to Curatola about beating probation.  I
12   don't know what is in there, honestly.  Mr. Danielo is a
13   very nice guy, encouraging me every time I see him to do
14   the right he thing, trying to get clients for personal
15   training.  I couldn't get enough.

16         I was making 7.25 an hour on the books.  And I
17   tried to modify my payments, $126, plus 20 towards
18   arrears, that Vigilliano [phonetic] had to pay it.  I
19   couldn't modify it.

20         So when I'm getting my check and paying my child
21   support, they are saying three payments, you lose your
22   licenses when you miss it.  Five or seven payments later,
23   you go to jail.

24         So after I cashed my check, I didn't even have
25   enough money to eat.

23

1      I told my mother I would help her with $100

2   weekly, and like I couldn't make ends meet.  And I

3   probably made the stupidest decision in my life.

4      Honestly, your Honor, I moved about ten pounds.

5   I understand people made money.  I made $100 a pound.  It

6   is pathetic.

7      THE COURT:  Do you want me to get the tapes, and

8   you will listen to the statements you made with

9   Mr. Curatola?

10     THE DEFENDANT:  Honestly, you're right.  I'm

11  wrong --

12     THE COURT:  It's not a question of may.  At this

13  point in time, Mr. Danielo says that he heard on the tapes

14  you telling Mr. Curatola, a known felon who you were

15  dealing drugs with, maybe only 10 to 20 pounds of

16  marijuana.  You told him, this is how you can get away

17  with it with Probation.  This is how you can act, like you

18  got a job, whatever it was.

19     And I'll be happy to listen to it.  But you are

20  on supervised release.  You are technically still in a

21  halfway house.  And guess what you are doing.  You are

22  calling up your buddies and dealing drugs.  Whether it was

23  10 pounds, 200 pounds --

24     THE DEFENDANT:  Right.

25     THE COURT:  -- there's nothing that sends off an



24

1   alarm that says to me you would have stopped at 20 or 100.

2          It was a question of opportunity, and there were

3   a lot more pounds going through this operation with

4   Curatola and David up in Canada.

5          THE DEFENDANT:  I understand, your Honor.  Trust

6   me, I have a very clear vision.

7          At this point in my life, I know one gram is too

8   much.  I probably, you know -- honestly, I've been in

9   programs in jail.  And you go into a program, and it is

10  inmates with a couple of hours and working as a counsel

11  with Gary Priboy.

12         The difference is when I use that knowledge, I

13  know that every action has a consequence.  And I really

14  wasn't thinking.  I'm thinking, let me make my support

15  payment.

16         What am I going to do?  Pretty much my back was

17  against the wall.

18         But I do realize normal people struggle and make

19  ends meet.  That's what I'm trying to do, so when I get

20  out, I have a system.  I don't have to rely on trying to

21  get a pound of marijuana and sell it.

22         THE COURT:  What do you think the system will be

23  when you get out?

24         THE DEFENDANT:  It will be worse for me because

25  my support payments are adding up.  I will desperately try

*OWEN WICKER, RPR*
*OFFICIAL COURT REPORTER*

25

1    to temporarily reduce my payments and live life on life's

2    terms.  If I have to get two jobs, fine.  Three jobs,

3    fine.  Because I'm not going back to jail for nothing.

4              THE COURT:  There's a lot of people doing two

5    and three jobs, a lot of people working on three or four

6    hours' sleep.  They are not making calls to people they

7    know to be drug dealers, convicted felons.

8              THE DEFENDANT:  You are right, your Honor.  You

9    are 100 percent right.  You are right.  And I made a bad

10   decision, and probably the most costly decision I ever

11   made in my whole life at this point.

12             I don't want to be some 47-year-old pot dealer.

13   Pathetic.  I want to try to get a title, at least

14   something, so she can say, my father has a title.  He's

15   something.

16             THE COURT:  Thank you, sir.

17             Anything the Government would like to ask?

18             MR. CANTY:  I think your Honor made all the

19   points that the Government would have made on the record,

20   so we'll rely on the record previously made.

21             THE COURT:  Mr. Sullivan, it's more than a

22   mistake.  You let your family down.  You let your family

23   down.  Judge Platt will deal with your violation next

24   door.

25             I think that the recommendation of the probation

26

1    department is more than lenient, and I truly think this

2    was one of those cases I might have well said, I am going

3    to make an upward and notify you of it.

4              I think your family has to come to grips with

5    the fact whatever their good intentions were or support

6    was, you had a very nice childhood. You didn't have any

7    drugs. You didn't have any abuse in the family. No

8    alcohol, excessive alcohol, consumption.

9              And your mother has always been extremely

10   supportive of you. She has seen it your way. It will be

11   devastating for her financially, but I don't have any

12   choice.

13             You have a 17-year-old daughter. Did you ever

14   think who might be selling her pot? Maybe you should.

15   Maybe you should think of a lot of things.

16             I'm sorry you are depressed, but I'm depressed

17   when I read a probation report like this, who you are

18   conning. And that's what it comes down to. You have to

19   deal with your choices, sir. And the Court will not go

20   over the prejudice of the probation department.

21             I will sentence you to 27 months in custody and

22   not any more, although it is well warranted to give you

23   more, and I will impose a supervised release term to be

24   four years.

25             There is no outstanding open counts, Mr. Canty?

27

1          MR. CANTY:  I don't believe so.

2          THE COURT:  You are to participate -- well, you

3     tell me that you don't have a drug problem?

4          THE DEFENDANT:  No.

5          THE COURT:  So the recommendation of the

6     probation department for inpatient program or detox

7     program, based upon what you said here and the fact that

8     you were clean for the months you were dealing with

9     Officer Danielo, I'll leave it up to the probation

10    department if they might find the need to put you in any

11    program.

12          In addition, you are to participate in any

13    mental health treatment program approved by the Court and

14    the standard consideration.

15          Based upon what you tell me your financial

16    obligations are, I would think you will not be able to

17    contribute much to that, if anything.

18          You shall not possess a firearm, ammunition or

19    destructive device, and you shall participate in an

20    education or vocational training program as approved by

21    the probation department.  They have programs available to

22    you, as you are taking the opportunity to hear what they

23    were saying.

24          In addition, you shall seek and/or maintain

25    viable employment that is approved by the probation

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

28

1   department.  And as a result, you have a search condition
2   and the standard conditions with that.

3          I impose a $100 special assessment that should
4   be paid today, and I also indicate that this sentence is
5   imposed for all the reasons I said, and also under 3553.
6   I believe it is important for your educational and
7   vocation training.

8          These are serious charges.  I don't think that
9   trading marijuana can be discounted.  When they said you
10  got a good painting business -- you will have enough money
11  to make payments with regard to child sport.

12         In addition, the Court needs to hear from the
13  Government about dismissal of Count 7 and the other
14  underlying charges of the indictment.

15         MR. CANTY:  With respect to the outstanding
16  counts, we ask that those counts be dismissed.

17         THE COURT:  That application is granted.

18         The defendant, I believe, doesn't have
19  sufficient assets to pay a fine, and the Court will not
20  assess a fine.

21         186 of the advisory guideline, a supervisory
22  release of at least four years is mandatory since the
23  defendant has a prior conviction for a felony drug
24  offense.  However, if the Court can find mitigating
25  factors under 3553(f) are there, the defendant can get a

29

1   guideline term of supervised release from two to three

2   years.

3           I don't find any real mitigating factors here in

4   view of the defendant getting involved in the same

5   activity not only when he was on supervised release but in

6   a halfway house, being required to submit to a curfew and

7   so forth.

8           Mr. Carman, based on the plea agreement, your

9   client doesn't have any right to appeal, but if he did, he

10  would have to file a notice of appeal within 14 days.  And

11  we would supply counsel from the Second Circuit funds if

12  he doesn't have counsel.

13          MR. CARMAN:  Thank you, your Honor.

14          MR. CANTY:  Thank you, your Honor.

15          THE PROBATION OFFICER:  Your Honor, could you

16  address the fine in this sentence to be consecutive?

17          THE COURT:  There is no fine.

18          THE PROBATION OFFICER:  The custody term.

19          THE COURT:  Yes.  I'm sorry.

20          The other sentence has to be consecutive, not my

21  sentence.

22          THE PROBATION OFFICER:  Okay.

23          (Proceedings concluded.)

24

25