Iasparra:      Yeah…

45.     After this conversation, on June 12, 2010, at about 8:33 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and Kerry Iasparra at phone number (203) 444-7339. During this conversation, Martin told Iasparra that he would leave the keys in the car. Iasparra asked "the other thing [i.e., likely drugs] is hidden, no?" Martin replied "Oh yeah, you'll be all set."

46.     On June 12, 2010, at about 6:09 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and an unknown male at phone number (203) 687-5699. During this conversation, the unknown male asked Martin if he had any "beans [i.e., likely pills]" left. Martin replied that he did and the unknown male stated that he wants to "snag" them that night. Martin told the unknown male that he could "leave them in the car", worst case scenario. They agreed to speak later.

47.     On June 14, 2010, at about 12:40 p.m., we intercepted a call over the Martin Cell Phone II between Steven Martin and Dominick Curatola at the Curatola Cell Phone III. In this conversation, Curatola offered to supply Martin with "Super Jack" marihuana for a price of "forty three, forty three fifty" [four thousand three hundred dollars ($4,300), or four thousand three hundred and fifty dollars $4,350)]. After this, on June 14, 2010, at about 3:46 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and Brian Savo in which Martin said that he was getting a supply of "Super Jacks," and that the price he was quoted was "5 3." [five thousand three hundred dollars($5,300)], which shows that Martin charges his customers a one thousand dollar ($1,000) per pound markup on the marihuana he re-sells. That Martin was pleased with Curatola's quoted price was shown in a text message which was sent on June 14, 2010, at about 5:04 p.m., to phone number (860) 398-3775, which read "Not to push you, but I'm heading to LI tomorrow to get

30

some suits [i.e., likely drugs from Dominick Curatola]. Anything you can come up with [i.e., likely money] would go along way." On June 14, 2010, at about 8:25 p.m., we intercepted another call over the Martin Cell Phone II between Steven Martin and Dominick Curatola regarding this potential transaction. In this conversation, Curatola described the supplier of the "Super Jack" as being a person who he needed to see "in person," as someone who would not speak about marihuana "over the jack" (telephone). The following day, June 15, 2010, at about 7:14 p.m., we intercepted a call over the Martin Cell Phone II between Steven Martin and Dominick Curatola in which Martin told Curatola that he would be unable to meet him the following evening [i.e., likely for the drug transaction] and would send someone else instead. On June 16, 2010, at about 10:23 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and Kerry Iasparra in which Iasparra agreed to drive that evening to make a pick up of an unnamed item for Martin. On June 16, 2010, at about 12:08 p.m., we intercepted an incoming call over the Martin Cell Phone II. During this conversation, Curatola told Martin that "we're definitely gonna be good" (meaning that Curatola would have marihuana to give to Martin). Martin told Curatola that he would have "Kerry come down." [i.e., Kerry Iasparra]. Martin said that tonight he would only grab "four," (meaning, four pounds of marihuana) because he did not have the money for more. However, we intercepted several conversations over the Martin Cell Phone I on June 17, 2010, which showed that this transaction did not occur.

48.    On June 15, 2010 at about 7:02 p.m., a text message was intercepted over the Martin Cell Phone I to Steven Martin from the Dave LNU cell phone at phone number (401) 525-1109, which read "how much for 100 tickets [i.e., likely 100 pills]." The Dave LNU cell phone then sent an additional text message, which read "of a price break. The cheapest I can find a sleeve for now is 18 [i.e., likely $18 per pill]." The Dave LNU cell phone then sent an additional text message, which

WIRE-00000477

read "are u on buying into the lake show" [i.e., likely betting on the Lakers- Celtics basketball game that evening. We intercepted several phone conversations and text messages during the authorized period of interception on both the Martin Cell Phones I and II pertaining to illegal bookmaking]. On June 17, 2010, at about 3:39 p.m., a text message was intercepted over the Martin Cell Phone I to Steven Martin from Dave LNU at phone number (401) 525-1109 which read "around 530-6 bro…you got those 10 tix [i.e., likely pills] for me?"

49.     On June 19, 2010, at about 11:46 a.m., a text message was intercepted over the Martin Cell Phone I to Steven Martin from the phone number (203) 996-6873, which read "Not much. Doing the same. Was wondering what's the deal. If its not too much trouble to brake something up for me [i.e., likely a request to purchase drugs]." Telephone (203) 996-6873 then sent an additional text message, which read "Same price as before?" On June 19, 2010, at about 6:03 p.m., a text message was intercepted over the Martin Cell Phone I to Steven Martin from phone number (203) 996-6873, which read "That's fine. Even if u want to do what we did last time. Leave it [i.e., likely drugs] somewhere." Then, on June 19, 2010, at about 7:59 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and an individual at phone number (203) 996-6873. During this conversation, the person using telephone (203) 996-6873 asked Martin, "The things there, two right?" Martin replied "Yeah, there are two there." Also on June 19, 2010, at about 12:14 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and an unknown male at phone number (203) 687-5699. The unknown male asked Martin, "Any of those beans left?" Martin replied "yep." The unknown male stated that he would stop by later that day.

50.     On June 20, 2010, at approximately 12:08 p.m., we intercepted an incoming call to the Martin Cell Phone II from the Curatola Cell Phone III. In this conversation, Curatola first apologized about the "other day" and explained that "this guy" (presumably, the person from whom

WIRE-00000478

Curatola was getting the marihuana that he was then re-selling to Martin) said that his "truck broke down" (the reason Curatola was unable to provide marihuana to Martin on June 17, 2010). Curatola then said that the shipment he was expecting had arrived. Martin talked about sending his guy down by tomorrow. Curatola responded that he didn't know if "Kerry (Iasparra) had kids" (since this is Father's Day, they were unsure if they could contact Iasparra to discuss a potential return to Long Island that day). Curatola assured Martin that he (Curatola) "has them myself, so he (Martin's courier) won't have to wait on them." Curatola told Martin that he would send Martin "four" and then "another." [a total of five (5) pounds of marihuana, one pound to pay for marihuana previously given to Curatola by Martin on credit].

51.    On June 21, 2010, at about 1:02 p.m., we intercepted a call over the Martin Cell Phone II between Steven Martin and Dominick Curatola at the Curatola Cell Phone III, wherein the following transpired:

Martin:...We're all set for tonight, I'm gonna send Kerry down there [i.e., likely
        Kerry Iasparra to pick up the five (5) pounds of marihuana both discussed on June
        20, 2010].

Curatola:    Okay.

Martin:Um, so I'm gonna give him, same thing, I'm just gonna pay cash for, for
        four (4) and then whatever he could do on top.

Curatola:    Okay. Alright, sounds good. The earlier the better, 'cause uh I'm gonna
        try and run back to him and grab more while ya know, while he still has (meaning,
        Curatola's supplier).

Martin:Alright, yeah so you have money then right?

Curatola:    Yeah.

Martin:I'm gonna try to send him up uh as early as he can possibly get down there. What time do
        you get back, from work and all that shit.

Curatola:    Um, I'm done, I'm off today so I'm good.

33

Martin: Alright, I'll uh I'll give him a call, I'll see what he was thinking. I know he was trying to do early like dinner time.

Curatola:     Okay.

Martin: Um, I'll give you a call um, as soon as [inaudible].

Curatola:     Alright...

52.     Immediately after this conversation, on June 21, 2010 at about 1:04 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and Kerry Iasparra at phone number (203) 444-7339.  During this conversation, Martin told Iasparra that "he [i.e., likely Curatola]" is off all day, so whenever [i.e., likely to meet for the marihuana deal]. On June 21, 2010, at about 5:04 p.m., we intercepted another call over the Martin Cell Phone II between Steven Martin and Dominick Curatola at the Curatola Cell Phone III.  During this conversation, Martin told Curatola that "Kerry" [i.e., likely Kerry Iasparra] left approximately a half hour earlier.  Curatola told Martin that he would also send him samples of some "Diesel" [i.e., another quality of marihuana].  Martin then told Curatola that he gave Iasparra enough (cash) for "four" (4 pounds) and if Curatola wanted to send five (pounds) back, that would be acceptable.

53.     On June 21, 2010 at about 9:52 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and Kerry Iasparra at phone number (203) 901-7722.  During this conversation, Martin asked Iasparra to "put that [i.e., likely marihuana Iasparra had just picked up from Curatola] in my truck." Iasparra replied that he would.  On June 21, 2010 at about 11:14 p.m., a text message was intercepted over the Martin Cell Phone I to Steven Martin from Kerry Iasparra at phone number (203) 444-7339, which read "Just left didn't lock," [i.e., likely Iasparra just left Martin's truck after putting the marihuana he had picked up from Curatola in there and did not lock the car].

34

54.     The following day, June 22, 2010, we intercepted a follow up conversation between Curatola and Martin over the Martin Cell Phone II at approximately 11:46 a.m. pertaining to this June 21, 2010 transaction.  In this June 22, 2010 conversation, Martin told Curatola that the product Curatola sent to him yesterday "looked good."  Curatola responded that he thought his supplier would  work with the "number" (the price) if they purchased a greater quantity.  Curatola also said that he would be getting "bc" marihuana in one month.  Martin said that he would show this product to his customers and then get back to Curatola with feedback.

55.     On June 23, 2010, at about 12:44 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and Kerry Iasparra at phone number (203) 444-7339, wherein the following transpired:

Iasparra:       …Can't believe how big some of these fuckers are.

Martin: Crazy.

Iasparra:       Yep, we're coming in right on schedule.
                    *              *              *              *

Martin: What you grabbed in the storage unit, I put it in the basement and it was just sitting right there like on the bottom of the steps.

Iasparra:       Well, by basement you mean garage?

Martin: No, my, my basement.  Yeah, just like I was, I didn't even break; oh you know to go yesterday, nothing. I was just sitting there and uh, she (presumably Martin's wife) came home from work at like late last night, like eight o'clock [inaudible] and she opened up the door, takes two steps down and was like why does it smell like weed in here?  I'm like oh fuck! I'm like I'm fucked, so fucked. So I walk down with her, follow her down there, she walks right by it, she goes to vase, she goes and gets a vase, she's like why does it smell like weed in here so much.  I was like oh, 'cause I smoked in here, ya know? I smoked a while a go.  She's like that's, its still smells that strong because of that? I'm like, [inaudible].

Iasparra:       Apparently.

Martin: I'm like, and then she got a vase and started walk around, I'm like, fuck, grabbed that thing and fuckin' hid it so bad, was like 'oh, shit.'

35

\*                  \*                  \*                  \*

Martin:How are they [i.e., likely the marijuana plants]?

Iasparra:      Um, probably like um, I dunno, probably under two feet.

Martin:But, they are wide as fuck, right?

Iasparra:      Kinda, wide, yeah, wide on their own, I didn't pluck nothing, really.

     56.      In this conversation, it is reasonable to conclude that Martin told Iasparra that he stored the marihuana he received the previous day from Curatola in his basement, the odor from the product being discovered by Martin's wife. The reference to the size of the plants I believe indicates that Martin and Iasparra are using a marihuana grow house in their business.

     57.      Later that day, on June 23, 2010, at about 4:49 p.m., we intercepted a call over the Martin Cell Phone II between Steven Martin and Dominick Curatola at the Curatola Cell Phone III. The following is a fair and accurate transcript of the relevant portions of the conversation:

Martin:…People  are liking those things.

Curatola:      Yeah.

Martin:They're uh, they're definitely nice, legit.

Curatola:      Okay.

Martin:Now, what, what's the deal, he does, he won't part with any on the uh, the cuff though?

Curatola:      Yeah, not yet. I'm still building a relationship with him; I mean he's
                giving me two or three for myself on the arm (meaning, on credit).

Martin:Right.

Curatola:      Nothing substantial.

Martin:Alright.

Curatola:      First it was one, then it was two, now it's three. Maybe, ya know as it gets
                going he will, ya know.

36

WIRE-00000482

Martin:Alright.  We'll that's alright, that, that's fine. That's the only thing, I'm
just taking a little bit 'cause I gotta, ya know, obviously I gotta either get money from
people, or 'cause I really have enough for like, ya know,  five myself.

Curatola:        Yeah.

Martin:But, I mean, like, like those are gone, I mean, I don't know if are, are they gonna be around
this weekend?

Curatola:        Yeah, yeah.  He's got a bunch, so I'm sure, I think like every two weeks
he gets a load.

Martin:I'm starting to gather up as much as I can (that is, money to pay for an additional supply of
marihuana and uh [inaudible] this weekend.

Curatola:        I'll give you a shout on uh, on Friday, I'll touch base with you…

58.    On June 24, 2010, at about 2:38 p.m., we intercepted a call over the Martin Cell

Phone I between Steven Martin and an unknown male at phone number (860) 398-3775. During this

conversation, Martin and the unknown male agreed to speak later in the day to determine when and

where to meet. On June 26, 2010, at about 11:56 p.m., we intercepted a call over the Martin Cell

Phone I between Steven Martin and an unidentified male at phone number (401) 699-4384.  During

this conversation, Martin and this male agreed to meet forty five minutes to an hour later.  On June

26, 2010, at about 12:17 p.m., we intercepted over the Martin Cell Phone I between Steven Martin

and an unknown person at phone number (203) 623-6258. During this conversation, Martin and the

unknown male agreed to meet at one o'clock that day somewhere in Connecticut in the vicinity of an

exit 57. On June 26, 2010, at about 12:26 p.m., Detective Contreras intercepted over the Martin Cell

Phone I between Steven Martin and an unknown person at phone number (203) 623-6258. During

this conversation, the unknown male told Martin he was getting on the highway and they agreed to

meet at exit 56 [i.e., likely for a drug transaction].  On June 26, 2010, at about 2:44 p.m., we

intercepted a call over the Martin Cell Phone I between Steven Martin and George LNU at phone

37

number (203) 687-5699. During this conversation, the unknown male asked Martin "are you all out of those?" Martin replied that he was not and they agreed to meet later that day. We intercepted many such cryptic conversations between Martin and various unidentified persons during the authorized period of interception over the Martin Cell Phone I. It is reasonable to conclude that these conversations pertain to Martin delivering a quantity of marihuana to those persons.

59.     On June 25, 2010, at about 5:52 p.m., we intercepted a call over the Martin Cell Phone II between Steven Martin and an unidentified male at phone number (401) 699-4384. During this conversation, this unidentified male told Martin "People are impressed, actually [i.e., likely with the quality of drugs that Martin provided]." Martin told the male "I hear ya, that's what I'm getting," people have been saying, "Damn, shit's fuckin' blazing." Martin and this male then agreed to meet one another the following day.

60.     Immediately after this call was completed, on June 25, 2010, at about 5:53 p.m., we intercepted a conversation over the Martin Cell Phone II between Steven Martin and Dominick Curatola at the Curatola Cell Phone III. The following is a fair and accurate transcript of the relevant portions of this conversation:

Martin:... Was gonna see if uh, you have five more of those uh like Sunday
        [meaning, another five (5) pounds of marihuana]

Curatola:     Okay, Sunday?  Yeah, we're all set.

Martin:Alright, I'll give you a shout uh, Saturday and if you have time, I'll come.  I'm gonna come
        down myself, so...

Curatola:     Okay.

Martin:I'll uh; I'll give you a shout on Saturday though.

Curatola:     Okay.

61.     The positive feedback for the marihuana Curatola gave to Martin continued in a

38

conversation intercepted on June 26, 2010, at about 11:46 a.m., over the Martin Cell Phone I

between Steven Martin and Brian Savo at phone number (203) 996-0010. During this conversation,

Martin told Savo "I'm going tomorrow and I'm gonna get more," presumably a reference to Martin's

planned trip to Long Island to get additional marihuana from Curatola. Savo told Martin that they

[i.e., likely that supply of marihuana] were getting rave reviews.    In fact, later that day, at

approximately 5:02 p.m., on June 26, 2010, we intercepted another conversation over the Martin Cell

Phone II between Martin and Curatola in which Curatola and Martin agreed to meet "tomorrow"

(Sunday, June 27, 2010) at around 3 p.m. Martin again told Curatola that he was ordering "five," (5

pounds of marihuana).   Curatola responded that his supplier was holding "seven" (7 pounds of

marihuana), and Martin repeated that he would take "at least five."

      62.    On June 27, 2010, at about 12:40 p.m., we intercepted a call over the Martin Cell

Phone II between Steven Martin and Dominick Curatola , wherein the following transpired:

Martin:..I was just gonna take off now

Curatola:    Okay.

Martin:Um, it's a hundred and ten percent guaranteed, right? (Martin apparently still somewhat
                 displeased that Curatola had caused him to send Iasparra on a meaningless trip to
                 Long Island

Curatola:    Huh? Yeah, definitely.

Martin:Alright, I'll uh, I'll leave now.  What's, what address should I put in my GPS?

Curatola:    Um, eight sixty five...

Martin:Yeah.

Curatola:    Broadway Ave...

Martin:Broadway Ave, okay.

Curatola:    That's Holbrook, H-O-L-B-R-O-O-K...

WIRE-00000485

Martin: Okay.

Curatola:      11741.

63.      On June 27, 2010, at about 1:10 p.m., we intercepted a call over the Martin Cell

Phone I between Steven Martin and an unknown male at phone number (860) 398-3775, wherein the

following transpired:

Martin:...I'm actually driving down to L.I. right now.

UM:          Okay, you going down or coming back?

Martin: Uh, I'm on my way down but uh, looks like, knock on wood the roads are
           moving. Um, yeah dude, people are going crazy for these things, I think you're uh,
           guys are really gonna like it.

UM:          Yeah, yeah. Like I said, I got a couple people that are waiting so...

Martin: Cool. I'll uh, I'll give you a shout tonight when uh I get back in town.

UM:          Good [inaudible] let me know.

Martin: Alright.

UM:          'Cause it looked like you said it looked good.

64.      Later that day, at approximately 3:30 p.m., Detective John Clinton and other members

of the DAS observed Dominick Curatola and Steven Martin meet at a street named Moonlight Walk,

which is in the area of Curatola's condominium complex on Broadway Avenue, in Holbrook, New

York. Martin arrived at the meeting driving a gray Nissan Altima, Connecticut registration 364

WWM, which is listed to Steven J. Martin, 18 Patrick Lane, Branford, Connecticut. Detective

Clinton saw both Curatola and Martin walk to the rear of a building at 885 Broadway Avenue,

Holbrook, New York and temporarily out of view. About three (3) minutes later, Martin came back

into view, walked to his car, and took a black plastic bag out of his car. He then went back around

40

the corner of the same building at 885 Broadway Avenue that he and Curatola went to originally, and again walked around the corner and out of view. Ten(10) minutes later, at approximately 3:40 p.m., Curatola left the building at 885 Broadway, got into his car, drove to a street named Twilight Walk, and parked his car. Curatola got out of the car carrying a small black plastic bag and went into one of the apartments. Approximately twenty (20) minutes later, at approximately 4:05 p.m., Curatola came out of that building, this time accompanied by Michael Decresenzo. At that time, Curatola was carrying a large black plastic garbage type bag that was slung over his shoulder. Curatola and Decresenzo placed the large black plastic garbage bag into Curatola's white Lexus, and drove that Lexus back over to the area of 885 Broadway where Curatola walked with Martin at 3:30 p.m. Both Curatola and Decresenzo got out of Curatola's white Lexus, and Curatola took the large black garbage bag out of his car and walked to around the corner of 885 Broadway and again went out of sight. At 4:10 p.m., Curatola and Decresenzo got into Curatola's white Lexus and drove away. One minute later, at 4:11 p.m., Martin was seen driving his Nissan Altima away from the complex.

65.     Once this meeting took place, we intercepted other communications which confirmed that Curatola had in fact sold what was likely five (5) pounds of marihuana to Martin. On June 27, 2010, at about 6:29 p.m., we intercepted a conversation over the Martin Cell Phone I between Steven Martin and Kerry Iasparra at phone number (203) 444-7339. During this conversation, Martin told Iasparra "I went to see your boy, Domino." On June 27, 2010, at about 6:50 p.m., a text message was intercepted over the Martin Cell Phone I to Steven Martin from the Richard Grasso cell phone at phone number (203) 996-6873, which read, "So did you come back with anything good?" On June 28, 2010, at about 1:00 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and George LNU at phone number (203) 687-5699. During this conversation, Martin and

41

George LNU agreed to meet [i.e., likely for a drug sale]. Martin asked "how many do you want?" George LNU replied "three". On June 28, 2010, at about 1:32 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and George LNU at phone number (203) 687-5699. During this conversation, Martin stated "when you come, just grab them, they're in the garage…" Martin then told George to come inside instead [i.e., likely inside Martin's house for a drug transaction]. On June 28, 2010, at about 12:54 p.m., we intercepted a call over the Martin Cell Phone II between Steven Martin and an unidentified male at phone number (401) 699-4384. During this conversation, Martin told this male that he got the "same thing" the other day [i.e., likely when he met Curatola]. The male then asked Martin if he needed anything 'cause his friend has extra. Martin replied that he would take a couple as he is sure he could "move [i.e., likely sell] them somewhere. The male told Martin he would put something together and then see Martin the following day.

66.   Also on June 28, 2010, at about 9:03 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and Richard Grasso at phone number (203) 996-6873. During this conversation, Grasso asked Martin if Martin had any "HGH" [i.e., likely Human Growth Hormone] for a guy that he knew. Martin replied that he did not, but that he believes his friend on Long Island [i.e., likely Dominick Curatola] would have them.

67.   On June 29, 2010, at about 2:03 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin and Brian Savo at phone number (203)996-0010, wherein the following transpired:

Martin:…I'm actually gonna go up uh early this afternoon and check on the girls [i.e., likely marijuana plants].

Savo:        [inaudible].

42

WIRE-00000488

Martin: See how uh, see how they're doing.  I wonder if uh this shit already grew back around it.

Savo:      I doubt it, I doubt it.  But, let me know.  I think uh your gonna be
             very happy.

Martin: Cool, cool.

Savo:      Yeah.

Martin: It's been perfect...

68.    On June 30, 2010, at about 4:21 p.m., we intercepted a call over the Martin Cell

Phone I between Steven Martin and an unknown male at phone number (203) 398-3775.  During this

conversation, Martin asked "How'd you make out".  The male replied that it was moving along but

he has not had any luck with the beast yet [referring to a type of marihuana].  The male further stated

that there was one that everyone loved and it looked like the bag was clear and you could see in it,

while the other bag had larger buds.  The male further stated that he should have almost "all of it"

and could meet Martin soon [i.e., likely to give him money].  Also on June 30, 2010, at about 6:35

p.m., a text message was intercepted over the Martin Cell Phone I to Steven Martin from the phone

number (203) 687-5699, which read "Got a request from school peeps for 30s [i.e., likely pills]. Said

id check if any were left."

69.    On July 2, 2010, at about 11:26 a.m., a text message was intercepted over the Martin

Cell Phone I to Steven Martin from an unknown person at phone number (860) 398-3775, which

read "there is blue guys if u need [i.e., likely pills]."  On July 2, 2010, at about 12:05 p.m., we

intercepted a call over the Martin Cell Phone I between Steven Martin and Richard Grasso at phone

number (203) 996-6873.  During this conversation, Martin told Grasso that he left "one of those

things" that Grasso wanted.  Martin stated that he left three hundred in the usual spot.  On July 2,

2010, at about 12:14 p.m., we intercepted a call over the Martin Cell Phone I between Steven Martin

43

WIRE-00000489

and Mike LNU at phone number (203) 996-8187. During this conversation, a person who identified himself as "Vinny's friend Mike" told Martin that he has a maroon F150 and Martin stated that he was in a Silver Nissan Altima. They agreed to meet near McDonald's and agreed to all get into the F150 when Martin arrived [i.e., likely for a drug deal].

c) The Curatola Cell Phones IV.

70.     On June 29, 2010, at approximately 4:56 p.m., we intercepted an incoming call to the Martin Cell Phone II from Dominick Curatola. This incoming call to the Martin Cell Phone II came from telephone (631) 334-4123. In the conversation, Curatola told Martin that he "wanted to give you this number so you have it." Martin asked if this was Curatola's "new number?" and Curatola responded "yeah, I got rid of the other one." Martin said, "ok, I'll call this one." Since June 29, 2010, there have been only three (3) conversations over the Curatola Cell Phone III, all of which were voice messages that were left with that telephone. Consequently, we are not in this application seeking continued authority to intercept communications over the Curatola Cell Phone III.

71.     According to the business records of Sprint, telephone (631) 334-4123 is listed to a Joe Coniglio, 860 Broadway Avenue, Holbrook, New York. Dominick Curatola lives at 865 Broadway Avenue, Holbrook, New York. The business records of Sprint also reflect that this telephone was activated on the day Curatola gave this "new number" to Martin, June 29, 2010.

72.     In further support therof, my review of call detail data supplied by Sprint regarding the Curatola Cell Phone IC disclosed that between June 29, 2010 and July 2, 2010, about one

Hundred and ninety (190) calls were placed between the Curatola Cell Phone IV and telephone number (631) 873-7307. As detailed above, this telephone is used by Eric Priemer, who is likewise involved in the drug trade. Also, my review of call detail data supplied by Sprint regarding the

44

Curatola Cell Phone IV disclosed that between June 29, 2010 and July 2, 2010, about one hundred and eight (108) calls were placed between the Curatola Cell Phone IV and telephone number (516) 456-6077. As noted above, it is likely that the 6077 telephone is used by Joseph Campo, who is involved with Curatola in the sale and possession of both marihuana and controlled substances. In addition, my review of call detail data supplied by Sprint regarding the Curatola Cell Phone IV disclosed that between June 29, 2010 and July 2, 2010, about ninety eight (98) calls were placed between the Curatla Cell Phone IV and telephone number (631) 603-7574. As described herein, the 7574 telephone is used by Brian Sullivan, who is likely involved in the marijuana trade. As such, it is likely to conclude that Dominick Curatola is using the (631) 334-4123 telephone in furtherance of his illegal activities.

73.    In light of the foregoing, there is probable cause to believe that Dominick Curatola, Dominic Valente, Scott Jacobson, Steven Martin, a person known only as "Mitch," a person believed to be Jerome Scelza, a person believed to be Stephen Gallagher, Christopher Colombo, Sabastian D'Amico, a person known only as "Pat," a person believed to be Kerry Iasperra, Brian Savo, Michael Decresenzo, Joseph Campo, Eric Priemer, a person known only as "Dave," their agents, co-conspirators and others yet unknown, have committed and will commit the crimes of Criminal Sale of Marihuana in the First Degree, in violation of Section 221.55 of the Penal Law, Criminal Possession of Marihuana in the First Degree, in violation of Section 221.30 of the Penal Law, and Conspiracy to commit those crimes, in violation of Article 105 of the Penal Law and that communications concerning those crimes have taken place and will continue to take place over the SUBJECT TELEPHONES.

74.    Further, there is probable cause to believe that Dominick Curatola, Joseph Campo, Steven Martin, a person believed to be Evan Sussman, a person believed to be Stephen Gallagher, a

45

person known only as "Pat," a person believed to be Lauren Weber, their agents, co-conspirators and others yet unknown, have committed and will commit the crimes of Criminal Sale and Possession of a Controlled Substance, in violation of Article 220 of the Penal Law, and Conspiracy to commit those crimes, in violation of Article 105 of the Penal Law.  There is probable cause to believe that communications involving those persons and pertaining to those crimes have taken place and will continue to take place over the SUBJECT TELEPHONES.

75.     The objectives of the Criminal Sale and Possession of Marihuana aspect of this investigation include the following: a) to identify the scope and complete membership of this conspiracy or conspiracies including Dominick Curatola,  Dominic Valente, Scott Jacobson, Steven Martin, a person known only as "Mitch," a person believed to be Jerome Scelza, a person believed to be Stephen Gallagher, Christopher Colombo, Sabastian D'Amico, a person known only as "Pat," a person believed to be Kerry Iasperra, Brian Savo, Michael Decresenzo, Joseph Campo, Eric Priemer, a person known only as "Dave," their agents, co-conspirators and others yet unknown;  b) to identify all the witnesses who can testify against  Dominick Curatola,  Dominic Valente, Scott Jacobson, Steven Martin, a person known only as "Mitch," a person believed to be Jerome Scelza, a person believed to be Stephen Gallagher, Christopher Colombo, Sabastian D'Amico, a person known only as "Pat,"  a person believed to be Kerry Iasperra, Brian Savo, Michael Decresenzo, Joseph Campo, Eric Priemer, a person known only as "Dave," and other individuals who are presently unknown, their co-conspirators, accomplices, agents, superiors and subordinates, as well as persons who can assist the District Attorney and other law enforcement officials in successfully identifying, apprehending and prosecuting all of the participants for this illegal conduct; c) to identify all locations used by  Dominick Curatola,  Dominic Valente, Scott Jacobson, Steven Martin, a person known only as "Mitch," a person believed to be Jerome Scelza, a person believed to be Stephen

46

Gallagher, Christopher Colombo, Sabastian D'Amico, a person known only as "Pat," a person believed to be Kerry Iasperra, Brian Savo, Michael Decresenzo, Joseph Campo, Eric Priemer, a person known only as "Dave," their co-conspirators and accomplices, for the storage of marihuana, records and proceeds of illegal marihuana distribution;  d) to seize all marihuana, records and proceeds of illegal marihuana distribution.

     76.    The objectives of the Criminal Sale and Possession of a Controlled Substance aspect of this investigation include the following: a) to identify the scope and complete membership of this conspiracy or conspiracies including Dominick Curatola, Joseph Campo,  Steven Martin, a person believed to be Evan Sussman, a person believed to be Stephen Gallagher, a person known only as "Pat," a person believed to be Lauren Weber, their agents, co-conspirators and others yet unknown; b) to identify all the witnesses who can testify against Dominick Curatola, Joseph Campo,  Steven Martin, a person believed to be Evan Sussman, a person believed to be Stephen Gallagher, a person known only as "Pat," a person believed to be Lauren Weber, and other individuals who are presently unknown, their co-conspirators, accomplices, superiors and subordinates, as well as persons who can assist the District Attorney and other law enforcement officials in successfully identifying, apprehending and prosecuting all of the participants for this illegal conduct; c) to identify all locations used by Dominick Curatola, Joseph Campo,  Steven Martin, a person believed to be Evan Sussman, a person believed to be Stephen Gallagher, a person known only as "Pat," a person believed to be Lauren Weber, their co-conspirators and accomplices, for the storage of  controlled substances, records and proceeds of illegal narcotics distribution;   d) to seize all controlled substances, records and proceeds of  illegal narcotics distribution.

     77.    There is a vast amount of information I cannot learn and evidence which I cannot gather unless court continues to authorize eavesdropping for the above-listed crimes over the

WIRE-00000493

SUBJECT TELEPHONES.

78.      Only through court-authorized eavesdropping on the Jacobson Cell Phone to obtain

evidence of illegal bookmaking activity did we intercept conversations involving Scott Jacobson's

efforts to obtain marihuana, and did we learn that he was involved in selling that marihuana with

Dominic Valente and the person believed to be Dominick Curatola.  Prior to using court-authorized

eavesdropping in this investigation, I had no information that Curatola was involved in any way with

these criminal activities. I had no information on the identities of the persons to whom he distributed

marihuana and controlled substances, nor did I have any information as to where he obtained those

items.  Now that we have obtained this information, our objectives are to identify and gather

evidence against all the persons involved in these activities.  As I have described above, Curatola

plans to go to the area of Miami, Florida beginning on July 9, 2010.  During the past period of

authorized interception, Curatola spoke to the individual on the telephone listed to Michael Nealy in

Hollywood, Florida, Curatola's interest in "getting up."  Given the context of this case, it is likely

that he is making that trip to Florida in part to establish access to a supply of cocaine.  He has also

discussed with "Dave" going to Montreal, Canada along with "Jerm," to discuss a business

proposition. Detective Kershow of the NCPD who is assigned to the DEA Task Force has explained

to me that most of the marihuana that comes into the eastern portion of the United States is imported

from Canada.  It is important to this investigation to continue using court-authorized eavesdropping

in order to determine if he establishes a potentially international marihuana or cocaine trafficking

network. Steven Martin has identified one of his  sources of marihuana as being a person located in

Rhode Island, but we have received evidence from the intercepted conversations that Martin receives

marihuana from the western part of the United States as well. While the target Steven Martin has

stated that one of his marihuana suppliers is in Rhode Island, and we have intercepted conversations

48

in which we have received the indication that Martin has a source of supply in the western part of the United States, we have yet to identify his sources or confirm if that is in fact true. The intercepted communications have shown that Curatola is not satisfied with his existing supply network, and is searching for other sources of marihuana and cocaine. Only through using court authorized eavesdropping on the SUBJECT TELEPHONES will we be able to identify and gather evidence against those suppliers. We have seen that Martin has contacted his supplier using the Martin Cell Phones. Only by using Court-authorized eavesdropping on the SUBJECT TELEPHONES can we identify all the persons involved in the criminal activities that I have cited throughout this affidavit, learn their methods, identify the locations where proceeds and records of these criminal activities are kept, and develop legally sufficient evidence against the persons involved in committing these crimes that is necessary for their successful prosecution.

79.     Furthermore, in my opinion, PROTECTED MATERIAL, conventional surveillance, search warrants, and other investigative means, reasonably appear to be unlikely to succeed if tried, and will not fully and successfully reveal the information sought or enable us to achieve the objectives of this investigation.

80.     PROTECTED MATERIAL In fact the intercepted conversations have shown that Jacobson is not currently involved in selling marihuana for Valente or Curatola. Jacobson never was involved in selling controlled substances for Valente or Curatola. It appears Jacobson does not know Steven Martin. PROTECTED MATERIAL, or any of Curatola's contacts in Florida. As a general matter, members of any organized criminal group are extremely wary about outsiders and would not allow anyone but a trusted member of the organization to be privy to their criminal activity. From hearing Valente and Curatola speak over the telephone, I believe it is extremely unlikely that we would ever be able to develop a relationship with them in which they would trust us sufficiently to

49

conduct criminal activity with them and to learn their methods.  PROTECTED MATERIAL.

81.    As I have described in detail throughout this affidavit, it is clear that the targets discuss their criminal activities on the SUBJECT TELEPHONES.   It is impossible for police officers to observe or overhear the conversations occurring over these telephones without intercepting these communications.  We cannot have police officers physically positioned in such a manner as to overhear these conversations when they are taking place over cell phones.  Thus, without authorization to intercept conversations taking place over the SUBJECT TELEPHONES, we cannot obtain the critical evidence of the conversations and conduct engaged in by the targets and their associates.

82.    Physical surveillance has been utilized in this investigation, but it is unlikely that physical surveillance alone will enable us to achieve the objectives of our investigation. Observations in these types of investigations are generally of limited use, since they merely identify those individuals who meet with the targets.   As important evidence of the crimes in this case consists of conversations intercepted over the telephones, physical observations of these individuals who meet the targets will not provide sufficient evidence of the commission of these crimes. Through eavesdropping on the Curatola Cell Phone, we were able to make observations of his contact with the Connecticut courier for the person believed to be Steven Martin, the delivery of marihuana to Joseph Campo, and identify Scelza, Gallagher, Colombo, D'Amico, and Michael Decresenzo, and Eric Priemer.  Without eavesdropping, we would not have had compelling evidence regarding criminal conduct.  We would only have evidence of those persons meeting with Curatola without proof of the reason these events took place.   This is all the more true when conducting surveillance of persons suspected of being involved in any form of drug trafficking.  Persons involved in that conduct do not conduct those transactions openly, making surveillance of meetings

50

of limited value without court-authorized eavesdropping to provide evidence of the reason the meetings took place.

83.     We may, in the future, apply for search warrants to search for physical items that are relevant to our investigation if we develop probable cause to search a location for those materials. At this point, we do not know where much of the evidence and proceeds of the criminal conduct I have described throughout this affidavit are kept. The execution of search warrants, at this time, would not accomplish the objectives of this investigation. Even if we successfully executed a search warrant and discovered marihuana, controlled substances, cash, or records, we would at best only be able to prosecute those at the location.  We would be unable to prosecute any other person within this group. In these circumstances, the mere execution of a search warrant, even if it resulted in the seizure of cash, a quantity of marihuana, controlled substances, or records, would likely leave many co-conspirators undetected.  For these reasons, I believe that the normal investigative techniques will not allow us to achieve all of the goals of this investigation.  Authority to intercept all the relevant conversations and communications taking place on the SUBJECT TELEPHONES is essential if we are to satisfy all of the objectives in this investigation.

84.     We have used pen registers and trap and trace data in this investigation for over seven (7) months pursuant to orders of this Court.  However, the use of pen register and trap and trace data alone will not enable us to meet the goals of this investigation.  Pen register and trap and trace data is simply call detail information law enforcement obtains contemporaneously, a listing of numbers which call, or are called by, a particular telephone.  While helpful to establish probable cause, this data will not provide sufficient evidence of the commission of these crimes, nor will it identify the persons involved in committing them.

85.     For the reasons set forth above, I believe that the normal investigative techniques will

51

not allow us to achieve all of the goals of this investigation. Many of the goals of this investigation remain to be achieved. Court-authorize eavesdropping on the SUBJECT TELEPHONES, in conjunction with other investigative steps, is essential if we are to satisfy all of the objectives in this investigation. If this Warrant is issued, appropriate investigative techniques will be used in conjunction with information from intercepted conversations.

86.    The marihuana related conversations to be seized over the SUBJECT TELEPHONES are those relating to the offenses of Criminal Sale of Marihuana in the First Degree, in violation of Section 221.55 of the Penal Law, Criminal Possession of Marihuana in the First Degree, in violation of Section 221.30 of the Penal Law, and Conspiracy to commit those crimes, in violation of Article 105 of the Penal Law respectively, including conversations of Dominick Curatola, Dominic Valente, Scott Jacobson, Steven Martin, a person known only as "Mitch," a person believed to be Jerome Scelza, a person believed to be Stephen Gallagher, Christopher Colombo, Sabastian D'Amico, a person known only as "Pat," a person believed to be Kerry Iasperra, Brian Savo, Michael Decresenzo, Joseph Campo, Eric Priemer, a person known only as "Dave," their agents, co-conspirators and others yet unknown, in which they discuss any and all aspects of selling and obtaining marihuana. Such conversations would include specifically, but not be limited to: conversations relating to the possession and sale of marihuana ; the quantity, quality and prices of the marihuana; the sources and chain of distribution of marihuana ; the identities of the buyers, sellers and carriers of marihuana; financing arrangements made for the delivery and resale of marihuana; and the collection, storage, transfer and disbursement of money and other proceeds of the sale of marihuana, which communications may be cryptic, guarded or coded.

87.    The controlled substance communications sought to be seized over the SUBJECT TELEPHONES pertain to the crimes of Criminal Sale and Possession of a Controlled Substance, in

52

violation of Article 220 of the Penal Law, and Conspiracy to commit those crimes, in violation of

Article 105 of the Penal Law respectively, including conversations of Dominick Curatola, Joseph

Campo, Steven Martin, a person believed to be Evan Sussman, a person believed to be Stephen

Gallagher, a person known only as "Pat," a person believed to be Lauren Weber, their agents, co-

conspirators and others yet unknown, in which they discuss any and all aspects of selling and

obtaining controlled substances. Such conversations would include specifically, but not be limited

to: conversations relating to the possession and sale of controlled substances; the quantity, quality

and prices of the controlled substances; the sources and chain of distribution of controlled

substances; the identities of the buyers, sellers and carriers of controlled substances; financing

arrangements made for the delivery and resale of controlled substances; and the collection, storage,

transfer and disbursement of money and other proceeds of the sale of controlled substances, which

communications may be cryptic, guarded or coded.

88.    The electronic communications to be seized consist of text messages and those dialed

digits which exceed those necessary to attain contact with another telephone instrument or digital

pager wherein the named targets or others unknown use the SUBJECT TELEPHONES to transmit

messages to the recipient relating to the above-described designated crimes under investigation.

89.    In view of the continuing nature of the criminal activity described herein, it is further

requested that should this Order be granted, its authorization not automatically terminate when

communications have been first obtained of the type described above, but rather that interceptions

continue for a period of thirty (30) days, that is, until August 6, 2010. As I described above, many

conversations and communications are made in one day in order to arrange a marihuana or

controlled substance transaction. According to Detective Rojas, it is common for persons who are

engaged in illegal drug conspiracies to have several conversations to arrange one transaction.

53

WIRE-00000499

Consequently, it is likely that additional criminal communications will occur after the initial interception.   In narcotics trafficking, a purchaser will contact his supplier only when necessary to obtain additional product. In any organized conspiracy, superiors often-times do not speak with subordinates for days or even weeks. Thus, a more limited time period may not allow the investigation to identify all of the significant members of this operation.  Furthermore, there is probable cause to believe that multiple conversations of the type described above will be intercepted because the investigation reveals that the targets described throughout this affidavit are engaged in a continuing illegal activity and that the SUBJECT TELEPHONES are used on a regular basis in furtherance of these activities.

90.     I have no reason to believe that the conversations sought to be intercepted are legally privileged. The conversations to be intercepted will continue to be recorded under my supervision or the supervision of another detective with the NCPD on digital video discs (DVDs) which will be safeguarded and protected from editing or other alteration and will be used solely and appropriately in the lawful investigation and prosecution of the crimes referred to herein.  The conversations will be intercepted and recorded at a designated office of the NCPD, in Nassau County, New York.

54

WHEREFORE, it is respectfully requested that this Court issue an Order of Amendment and

Extension pursuant to the Application of Kathleen M. Rice, District Attorney of Nassau County, in

the form annexed hereto.

_____

ANGELO LaMORTE

Sworn to before me, this
7th day of July, 2010.

_____

Notary Public

55

WIRE-00000501